# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **LARRY L. PITTMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:04cv1135** |
| | ) | **Judge Wiseman** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

Plaintiff Larry L. Pittman filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of the Social Security Administration denying his application for Supplemental Security Income ("SSI"), as provided by the Social Security Act.

Plaintiff filed an application for SSI on August 23, 2001, alleging disability beginning June 3, 2001. (Doc. No. 5, Attachment (Administrative Record) (hereafter, "AR") 53-56.) Plaintiff alleged that he suffered "massive head injuries," including two concussions and brain bleeding, resulting in memory loss, lack of motor skills, headaches, nausea, and an inability to lift anything weighing over five pounds. (AR 63.) Plaintiff's claim was denied initially and upon reconsideration. (AR 27-30, 97.) A hearing was held before an Administrative Law Judge ("ALJ") on October 2, 2003, and an unfavorable decision issued March 24, 2004. (AR 21-26, 39, 10.) Plaintiff requested review of the hearing decision, and the Appeals Council denied this request on October 28, 2004. (AR 9, 5-7.) The decision of the ALJ became the final decision of the Commissioner, and Plaintiff now requests judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

Presently before the Court is Plaintiff's Motion for Judgment on the Record (Doc. No. 10). The Defendant Commissioner has filed a response in opposition thereto (Doc. No. 11). For the reasons set forth below, the Court finds that the ALJ's determination is supported by substantial evidence in the

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

record, and each of Plaintiff's objections to his findings is without merit. The Plaintiff's motion for judgment will be denied and the Commissioner's decision affirmed.

I.      **BACKGROUND**

Plaintiff was born August 16, 1949, is currently 57 years old, and was 51 years old on June 3, 2001, the alleged onset date. (AR 27, 134.) Plaintiff received a high school diploma and completed two additional years at McKenzie College, receiving an associate's degree in business. (AR 148.) Plaintiff has been self-employed periodically over the past twelve years as a barbeque restaurant owner, designer and marketer of a line of beachwear, and as a personal trainer. (AR 229-30.) The ALJ determined that work as a personal trainer qualified as past relevant work. (AR 17.)

Plaintiff first filed for disability on August 23, 2001. (AR 53-56.) The claim was denied initially, denied again upon reconsideration, and denied a third time following a hearing by decision of an ALJ on March 24, 2004. (AR 53, 20.) The Appeals Council denied Plaintiff's request for review of the hearing decision on October 28, 2004. (AR 5.)

Plaintiff's primary care physician is Dr. Bradley Bullock, although Plaintiff was referred to and treated by several other physicians during the relevant time period. (AR 65.) Plaintiff's alleged impairments stem from a head injury sustained on June 3, 2001 while he was in the custody of the Williamson County Sheriff's Department. Plaintiff was apparently beaten by several inmates, discovered unconscious or semi-conscious by the jail guards, and transported to the Williamson County Medical Center and then to the Vanderbilt University Medical Center Emergency Room. (AR 225-26.) Dr. Noel Tulipan, a neurosurgeon at Vanderbilt University Medical Center, was Plaintiff's attending physician throughout his initial stay, and continued to treat Plaintiff thereafter on an ongoing basis. Plaintiff was also treated by Dr. Okpaku, Jeffrey Bryant, Ph.D., Dr. Steven Nyquist and Dr. Louise Mawn, and he was evaluated by several DDS examiners.

With respect to the June 3, 2001 assault, medical records from Vanderbilt University Hospital indicate that Plaintiff reported being struck with an unknown object on the left side of his face. (AR 134) Although he had a period of amnesia, he reported that he did not lose consciousness. However, later the same day, Plaintiff was purportedly again assaulted and briefly lost consciousness. He experienced confusion, disorientation, and decreased hearing in his right ear. A head CT scan taken at the Williamson

County Medical Center revealed "left frontal contusion/shear injury with some layering of traumatic subarachnoid hemorrhage in the left parietal convexity as well as the tentorial area." (AR 134) Plaintiff was transferred to Vanderbilt University Medical Center for neurological observation. (AR 133.)

Physicians at Vanderbilt University Medical Center administered another head CT scan. This scan revealed "left frontal contusion, shear injury and some other dots of shear injury in his brain." (AR 133.) Plaintiff was held for observation in the hospital for two days and discharged on June 5, 2001 with instructions to follow up in six weeks. Plaintiff was placed on Dilantin, Lortab and Reglan. (AR 133.) He was released from Vanderbilt back to the Williamson County Jail, and his daughter posted bail. (AR 141.)

Plaintiff had a follow-up appointment with Dr. Tulipan on July 30, 2001. (AR 132.) Dr. Tulipan reported, "he appears to be doing reasonably well, although he certainly has significant new deficits" including right arm and leg weakness and pain, rigidity in the right side of the neck, memory problems, and anxiety attacks. (AR 132.) Dr. Tulipan advised that these symptoms were to be expected following a head injury, and that maximum improvement would not be reached for a year to eighteen months. Dr. Tulipan also noted that Plaintiff was seeing a psychiatrist, who had recommended that Plaintiff undergo neuropsychological testing. (AR 132.)

Dr. Jeffrey Bryant conducted a neurological evaluation on August 2, 2001. (AR 177-79.) Dr. Bryant observed that, pre-injury, Plaintiff had been very bright, independent and self-sufficient.[2] Objective test data revealed a significant post-injury decline in some cognitive abilities. Specifically, he noted a marked difference between Plaintiff's verbal and performance IQ scores. Dr. Bryant opined that deficits in attention to visual detail and speed of processing contributed to Plaintiff's lowered test scores. Dr. Bryant also noted that Plaintiff demonstrated signs of depression, some paranoia, identity instability, and feelings of anger/aggression towards others whom he perceived as responsible for his situation. (AR 178.) Given Plaintiff's extreme level of independence pre-injury, Dr. Bryant opined that Plaintiff's difficulty coping with *any* limitations was to be expected. Dr. Bryant concluded that Plaintiff would likely continue to improve, albeit with difficulty owing to his extreme independence, and he opined that Plaintiff would benefit from rehabilitation and counseling. (AR 179.)

---

[2] Pre-injury, Plaintiff worked only periodically as a personal trainer and apparently spent the rest of his time completing rigorous athletic endeavors and traveling. His pre-injury lifestyle involved limited work commitment and a high level of independence. (AR 178.)

Dr. Deborah Doineau, a psychologist and DDS examiner, conducted an examination of Plaintiff on October 5, 2001. (AR 146.) She noted that Plaintiff was well-spoken and oriented but that his memory was patchy in areas. (AR 148.) She also opined that while his outward demeanor was controlled, "he appeared to be seething with anger over the assault incidents." (AR 148.) Dr. Doineau administered an intelligence test and noted that attention and concentration were "okay in the short term" but that Plaintiff had difficulty "with sustained concentration at times." (AR 150.) Dr. Doineau, like Dr. Bryant, noted a marked difference between Plaintiff's verbal and performance IQ scores. (AR 150.) She attributed the disparity to concentration issues or poorly developed perceptual organization skills. (AR 150-51.) Dr. Doineau found that Plaintiff's memory was "better in some areas than in others" but not seriously impaired in any area tested.[3] (AR 152.) Dr. Doineau diagnosed a single episode of major depression of moderate severity, with possible symptoms of post-traumatic stress disorder, and a possible mild targeted decline in certain areas of memory. (AR 152.)

Dr. Martin Wagner, a DDS examiner, evaluated Plaintiff on October 12, 2001. (AR 140-45.) Plaintiff presented to Dr. Wagner complaining of short-term memory impairment, loss of motor skills (especially the right side), chronic daily headache and chronic nausea. (AR 141.) However, Dr. Wagner found no evidence of any loss of motor skills on the right side. (AR 144.) Results of a neurological exam were, in fact, "entirely normal." (AR 144.) Dr. Wagner similarly refuted Plaintiff's claims of short-term memory impairment. Neurologic and mental status exam results were inconsistent with Plaintiff's claims of memory and cognitive difficulties, and Dr. Wagner concluded that Plaintiff's reported problems were unsupported. While Dr. Wagner believed that Plaintiff did suffer from daily headaches, he attributed these headaches to "analgesic overuse syndrome" and called them "rebound headaches." (AR 144.) Dr. Wagner concluded by noting that Plaintiff had no difficulties lifting, carrying, standing, walking, or sitting. He further opined that Plaintiff experienced no trouble with fine motor coordination of either hand nor with vision, hearing, speech or balance, and was not subject to any environmental restrictions. (AR 145.)

Dr. Edward Sachs, Ph.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff on November 7, 2001. (AR 168-70.) Despite finding that Plaintiff was "not significantly limited" in the majority of the twenty enumerated categories, Dr. Sachs did report some moderate limitations in

---

[3] Dr. Doineau administered the Wechsler Memory Scale, third edition (WSM-III), which tests various aspects of auditory, visual, working, and general memory. (AR 151-52.)

areas such as "ability to carry out detailed instructions," "ability to maintain attention and concentration for extended periods," and "ability to respond appropriately to changes in the work setting." (AR 168-69.) Dr. Sachs also noted, however, that despite difficulties in concentration Plaintiff could still perform simple and detailed, non-complex tasks during a full work week. (AR 170.) Dr. Sachs additionally observed that despite Plaintiff's sensitivity to criticism, he could "still respond appropriately and meet basic social demands in a work setting." (AR 170.)

Plaintiff's application for disability was denied on November 14, 2001. (AR 31-34.) Plaintiff filed a request for reconsideration on December 18, 2001. (AR 35-36.) He completed a Reconsideration Disability Report on January 2, 2002, listing "more anxiety" and noting difficulties with motor skills and orientation to time and day of the week. (AR 97-100.)

On March 11, 2002, Plaintiff's neurosurgeon, Dr. Tulipan, sent a letter to Dr. Kay Son, one of Plaintiff's treating physicians. (AR 174.) Dr. Tulipan opined that while Plaintiff seemed to be doing "reasonably well," he recommended a psychiatric consultation and anti-depressant medication. He "strongly" suggested that these recommendations be followed in a timely manner, due to his opinion that Plaintiff exhibited violent tendencies and might harm himself or others. (AR 174.)

Dr. Son examined Plaintiff on March 18, 2002. (AR 187.) Plaintiff presented requesting eye and psychiatric referrals and complaining of headaches and short-term memory loss. Dr. Son referred Plaintiff to a neurologist and recommended follow-up in six months. Dr. Son saw Plaintiff again on May 15, 2002, and noted that Plaintiff's memory and headaches were improving. He noted changes in medications, including that Plaintiff was taking hydrocodone, per his psychiatrist. (AR 187.)

Upon referral from Dr. Son, Dr. Louise Mawn, an ophthalmologist, examined Plaintiff on April 2, 2002. (AR 171-73.) Plaintiff complained of disturbances at the edges of his visual fields, as if he were seeing things that were not actually there. (AR 171.) Dr. Mawn found that Plaintiff's uncorrected vision was 20/100 in his right eye and 20/200 in his left. (AR 172.) Formal visual fields testing revealed that despite the fact that Plaintiff's vision was blurred, his visual fields were full. (AR 172-73.) Dr. Mawn was unable to explain why she could only correct Plaintiff's vision to only 20/40 and no better in the left eye, and asked for a follow up in four months for re-evaluation. (AR 173.)

On July 1, 2002, Dr. Tulipan wrote a status letter to Plaintiff's then-attorney, Lisa Carson, stating that he had seen Plaintiff several times since the initial assault, most recently on April 26, 2002. He noted that Plaintiff had continued complaints of emotional problems, including depression, and stated that because Plaintiff was one year post-injury, he had likely reached maximum medical improvement. He also opined that Plaintiff's emotional problems were chronic. Finally, Dr. Tulipan stated that "most of [Plaintiff's] problems are psychological in nature" and recommended evaluation by a qualified neuropsychologist. (AR 197.)

Plaintiff returned to Dr. Son on August 9, 2002. (AR 184.) Plaintiff reported no headaches that day but claimed to have tenderness in the right temporal area. (AR 184.) On September 20, 2002, Plaintiff asked about stopping his medication, apparently due to adverse side effects. (AR 183.) Plaintiff continued to report chronic headaches at a frequency of eight to ten per month. (AR 183.) On April 30, 2003, Plaintiff returned to Dr. Son complaining of worsening headaches and difficulty sleeping. Dr. Son prescribed Lortab and Celebrex, noting depression and problems with aggression. (AR 181.)

Dr. Steven Nyquist, a psychiatrist, evaluated Plaintiff on March 29, 2002. Dr. Nyquist noted that Plaintiff suffered from "depression, anxiety, and anger." (AR 218.) He made a note to refer Plaintiff for therapy. Dr. Nyquist saw Plaintiff again on May 1, 2002, and noted that Plaintiff was "no threat to others" and "fe[lt] better, less [illegible] hostile." (AR 216.) In a November 22, 2002, letter to Plaintiff's attorney Phillip Davidson, Dr. Nyquist declined to offer any opinion about Plaintiff's condition or treatment. However, he noted that his primary goal had been to keep Plaintiff's anger and impulse control problems managed with medication. (AR 212.) During Plaintiff's January visit (presumably 2003, day and year illegible), Dr. Nyquist noted that Plaintiff "handled self in court house" and that Plaintiff was doing better on his prescription medications. (AR 211.)

An administrative hearing was conducted on October 2, 2003, before ALJ Mack Cherry. (AR 222-47.) At the hearing, Plaintiff testified that he was "gang assaulted" while in custody at the Williamson County Jail. (AR 225.) Plaintiff stated that he underwent evaluation and treatment by emergency physicians, psychiatrists, and DDS examiners. (AR 225-26.) Plaintiff testified that he experienced difficulty with his vision and reading, and that he suffered from excessive anger, anxiety, and short-term memory problems. (AR 226-27.) He said that he had stopped listening to music and could no longer run,

swim or bike for exercise.  He claimed to have no social life and to have alienated everyone except for his daughters.  Plaintiff's lawyer asked whether he thought he could work with others, and Plaintiff responded in the negative.  Plaintiff reported that he experienced coordination problems with his entire right side, and testified that he now lacked the confidence and ability to travel the world as he once did.  (AR 227.) Citing anxiety and anger, Plaintiff expressed that he was just more comfortable being alone than with others.  (AR 228.)  Listing his current medications as Depakote, Celexa, Zyprexa, hydrocodone, Imitrex, and Celebrex, Plaintiff also testified that before he was injured, he was reluctant to take even aspirin.  (AR 228.)

Plaintiff told the ALJ that he repeatedly runs up and down the stairs in his daughter's house for exercise.  (AR 228.)  Plaintiff testified that he does not drive very often, in part because he is afraid that he will not be able to remember his way home.  (AR 229.)  Plaintiff testified that he has an associate's degree in business administration and that, prior to his injury, he owned a barbeque restaurant and designed, manufactured and marketed a line of beachwear.  (AR 229-30.)  Prior to his injury, Plaintiff was a personal fitness trainer for about twelve years, last pursuing this type of work in February or March of 2001.  (AR 230-32.)  Plaintiff testified that he only had to make enough money to support himself and to finance his extended trips abroad, and that he usually made about $6,000 every three months.  (AR 231.) Plaintiff also explained that he was an artist who enjoyed painting on glass before his injury, but he had not painted since before the incident at the jail.  (AR 233.)

Plaintiff testified that his medication makes him emotional and angry.  He stated that he was in therapy with Dr. David Nyquist.  However, during the hearing, Plaintiff's attorney informed the ALJ that Dr. Nyquist had stopped treating Plaintiff because Plaintiff was "having too much anger."  (AR 234.)  Plaintiff's attorney claimed to have letters and records stating that the doctor was refusing to treat Plaintiff, though Plaintiff had no knowledge of any such decision.[4]  (AR 235.)

---

[4] The plaintiff's attorney did submit late-filed exhibits consisting of medical records and a letter from Dr. Nyquist.  Despite one hand-written notation on a medication log warning "do not provoke, do not anger this patient," the remainder of the submitted materials do not support an assertion that Dr. Nyquist refused to treat Plaintiff due to anger issues.  It is also notable that the "warning" note was written in a large, feminine script that does not match the handwriting of Dr. Nyquist's actual treatment notes. Significantly, Dr. Nyquist makes predominantly positive comments about Plaintiff in those treatment notes, such as "handled self in court," "better on prescriptions," and he even said in May 2002 that Plaintiff was "no threat to others" and "fel[t] better, less . . . hostile."  (AR 211, 216.)

Plaintiff answered questions about his activities of daily living, stating that he did "pretty much everything that needs to be done" around the house, including mopping the floors and helping his granddaughter with her education, though he stated that post-injury, he found it difficult to help her with her math homework. (AR 236.) Plaintiff testified that he sleeps twelve to twenty-four hours a night, perhaps due to the medications. He does not attend church or social events and claimed that he had not left the house for over two years except for doctor's appointments. (*Id.*) Plaintiff stated he does not have trouble dressing himself but is not as coordinated as he used to be on the right side of his body. (AR 238.) Physically, Plaintiff believes that now he is better than he was a year ago. Mentally, he thinks he is "a little darker." (AR 239.) He testified that he has no current income. (*Id.*)

Plaintiff's daughter, Kimberly Brogden, testified that her father lived with her and that his short-term memory loss had improved. She testified that she has to help him take his medication. She said that he no longer enjoys reading books or newspapers due to his memory problems. She stated that his attention span had decreased. (AR 240.) Plaintiff's daughter described how Plaintiff formerly watched Jeopardy! but no longer enjoyed the show because he could no longer answer the questions. (AR 241.) She testified that she was a stay-at-home mom with a sixteen-month-old daughter, and that her father helped with her daughter but was not left alone with her.[5] (AR 242.) The daughter testified that her sources of income included a sister living with her, two forms of child support, and Social Security disability from her youngest daughter's father. (AR 242-43.)

The ALJ next questioned the vocational expert ("VE"), Jane Breton. (AR 243.) The VE testified that work as a personal trainer was a job classified at a medium level of exertion and as a skilled job. (AR 243.) In response to a hypothetical, she opined that a person with Plaintiff's characteristics, including moderate limitations in the ability to carry out detailed instructions, maintain attention and concentration for an extended period of time, deal with the general public, supervisors, and complete a normal workday, would still be able to complete his past relevant work as a personal trainer. (AR 243-44.) The VE further testified that even given a more marked limitation in dealing with the general public, there would be 1,600 jobs as a product inspector, 9,300 as a table assembler, and 3,200 hand packing jobs available at the medium level, with an additional 5,100 hand packing jobs, 11,000 table assembler jobs, and 1,200

---

[5] This granddaughter is presumably not the same granddaughter whom Plaintiff helped with her math homework.

product inspector jobs at the light level. (AR 244-45.) The ALJ next asked the VE to consider the limitations contained in Exhibit 13F, the medical source statement completed by Dr. Nyquist on June 18, 2003. (AR 190-92.) The VE noted that this assessment included marked limitations in interacting with the public, supervisors, and coworkers, responding appropriately toward work pressures and usual work settings, and responding appropriately to changes in routine work setting. (AR 245.) The VE concluded that such marked limitations would render an individual with those characteristics unable to perform any work. (*Id.*)

Based on the record, the ALJ made the following findings in his March 24, 2004, decision:

1.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.  The claimant's mental and physical residuals from a head injury are considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The claimant has the following residual functional capacity: medium work allowing for moderate limitations in the ability to carry out detailed instructions, maintain attention and concentration for extended time, dealing with supervisors and the general public.

6.  The claimant is unable to perform any of his past relevant work (20 CFR § 416.965).

7.  The claimant is an "individual of advanced age" (20 CFR § 416.963).

8.  The claimant has a "high school (or high school equivalent) education" (20 CFR § 416.964).

9.  The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 416.968).

10. The claimant has the residual functional capacity to perform a significant range of medium work (20 CFR § 416.967).

11. Although the claimant's exertional limitations do not allow him to perform the full range of medium work, using Medical-Vocational Rule 203.15 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as [sic] medium jobs including product inspector (1,600 regional jobs), table assembler (9,300 regional jobs) and hand packer (3,700). These are jobs that could be performed at the light exertional level as well. At a light level, the number of jobs available in the region are as follows: product inspector (1,200), table assembler (11,000), and hand packer (5,700).

12.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)).

(AR 19-20.)

## II. DISCUSSION

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g.*, *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g.*, *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g.*, *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the claimant, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the claimant must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)). A claimant who is performing

substantial gainful activity is not disabled no matter how severe his medical condition may be.  *See, e.g.,* *Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the claimant must show that he suffers from a "severe impairment."  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment.  42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry, regardless of age, education or work experience.  *Heston*, 245 F.3d at 534 (citing 20 C.F.R. §§ 404.1520(d) and 416.920(d)).  Alternatively, the claimant may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death.  *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (1988).  A claimant is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability.  *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (1989).

Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.  *Heston*, 245 F.3d at 534.  The claimant has the burden of proving inability to perform past relevant work or that a particular past job should not be considered relevant.  *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (1989).  If the claimant fails to carry this burden, he must be denied disability benefits.

Once a claimant establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the claimant can perform

other substantial gainful employment and that such employment exists in the national economy. *See, e.g.*, *Felisky v. Bowen*, 35 F.3d 1027, 1035 (1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs the claimant can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner to carry her burden under appropriate circumstances). It remains the claimant's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that he can perform, he is not disabled. *Heston*, 245 F.3d at 534. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances). In this case, the ALJ resolved Plaintiff's case at step five of the inquiry. The ALJ found, *inter alia*, that Plaintiff has the residual functional capacity to perform jobs that exist in significant numbers in the regional economy. (AR 709.)

Here, Plaintiff asserts several grounds for reversal. First, Plaintiff asserts that the ALJ erred by not finding that his condition met the listing of impairments in Appendix 1, Subpart D, Regulation No. 4. (AR 19.) Second, Plaintiff argues that the ALJ erred in finding that Plaintiff's allegations regarding his anger problem were "not totally credible." (AR 19.) Plaintiff's third allegation is that the ALJ erred in finding that his symptoms were not sufficiently severe. Fourth, Plaintiff alleges that the ALJ erred in determining that Plaintiff could perform a medium range of jobs. Fifth, Plaintiff asserts that the ALJ erroneously concluded that Plaintiff was not under a disability at any time through the date of decision.

In his decision dated March 24, 2004, the ALJ employed the appropriate five-step evaluation process. The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (AR 14.) He then found that the medical evidence indicated that Plaintiff "had mental and physical residuals from a head injury, impairments that are 'severe' within the meaning of the Regulations

but not 'severe' enough to meet or medically equal, either singly or in combination[,] to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (AR 16.) The ALJ found Plaintiff had performed past relevant work as defined in the Regulations at 20 C.F.R. § 416.965 as a personal trainer. He also found that Plaintiff could not return to his past relevant work as a personal trainer, due to the necessary physical conditioning. (AR 17.) However, after consideration of the medical records and testimony, the ALJ determined that Plaintiff's allegations of limitations were not fully credible and that Plaintiff retained the capacity to perform work that exists in significant numbers in the national economy, and is therefore not disabled as defined by the Social Security Act. (AR 17, 19.)

A. **The ALJ did not err in determining that Plaintiff's impairments did not meet or medically equal a listed impairment.**

Plaintiff asserts that the ALJ erred at step three of the sequential evaluation process by finding that his impairments did not meet a listed impairment.[6] (Pl.'s Br. (Doc. No. 10) at 3.) Plaintiff alleges that his impairments meet Listing 11.00(F) for traumatic brain injury ("TBI") and that he suffers from a personality disorder that meets the criteria contained in section 12.08.[7] For the following reasons, the Court finds that the ALJ did not err in conducting his analysis at step three.

At the third step in the sequential evaluation process, the ALJ considers the medical severity of a plaintiff's impairments to determine whether those impairments meet both the duration requirements and the specific criteria contained in the listing of impairments in Appendix 1 of Subpart P ("the listings"). 20 C.F.R. § 404.1520(a)(4)(iii). Plaintiff has the burden of proving his impairment is included in or equal in severity to those contained in the listings. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). If a plaintiff's impairment meets or equals a listed impairment and meets the duration

---

[6] The plaintiff notably does not make the separate and more complicated argument that his impairment(s) medically *equal* a listed impairment; accordingly, this Court focuses its analysis on whether Plaintiff's impairments actually meet the specified listings. However, the ALJ explicitly stated that he found that Plaintiff's impairments neither met nor medically equaled a listed impairment. (AR 16.)

[7] The plaintiff erroneously asserts that TBI can be evaluated using the criteria in § 12.00, citing §§ 12.04 (affective disorders), 12.06 (anxiety disorders) and 12.08 (personality disorders). The listing governing TBI states that cerebral trauma may be evaluated under §§ 11.02, 11.03, 11.04, and 12.02, as applicable. The introduction to § 12.00 states that "[i]mpairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings." Therefore, the only possibly relevant portion of § 12.00 would be § 12.02, organic mental disorders. However, because Plaintiff's brief contains citation and discussion of the § 12.08 criteria, this Court will construe those arguments as a separate assertion that Plaintiff's impairments meet § 12.08, with the understanding that this section is not implicated by or relevant to evaluation of Plaintiff's traumatic brain injury.

requirement, an automatic finding of disability results, without inquiry into his age, education, or work experience. 20 C.F.R. § 404.1520(d). Though the ALJ may make credibility assessments at steps four and five, determinations at step three must be made purely on the medical evidence. 20 C.F.R. § 404.1526(b). Medical evidence must be supported by acceptable clinical and diagnostic techniques, and must include a showing that all of the specified medical criteria are present. *See Dorton v. Heckler*, 789 F.2d 363, 366 (6th Cir. 1986), 20 C.F.R. § 416.925, *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990), *Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987).

Plaintiff first asserts that his severe brain injury meets § 11.00(F), governing traumatic brain injury. TBI may be evaluated under §§ 11.02, 11.03, 11.04, and 12.02, as applicable. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Of the enumerated sections of 11.00(F), only section 12.02, organic mental disorders, is potentially relevant to this plaintiff.[8] Section 12.02 requires proof of both a medically substantiated organic mental disorder (paragraph A) and demonstration of at least two of a set of impairment-related functional limitations (paragraph B) or, if these are not met, a set of additional functional criteria (paragraph C). Section 12.08 deals with personality disorders, and also requires proof of a medically substantiated condition (paragraph A) and at least two of a set of functional limitations (paragraph B), which are identical to the functional limitations set out in paragraph B of § 12.02.

Though the ALJ found that Plaintiff had medically determinable mental and physical impairments resulting from a head injury, he concluded that "these impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (AR 19.) In his analysis at this step, the ALJ discussed the objective medical evidence of record, including evidence relating to both Plaintiff's physical and psychological difficulties. (AR 14-16.) The ALJ discussed Plaintiff's injuries, diagnoses, and treatments; he additionally cited medical records, disability examinations, and consultative exams from Drs. Tulipan, Wagner, Sachs, Nyquist, and Doineau, among others.

---

[8] Sections 11.02 and 11.03 deal with convulsive and nonconvulsive epilepsy, respectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Section 11.04 deals with central nervous system vascular accidents. Section 12.02 addresses organic mental disorders. Here, Plaintiff has neither alleged, nor is there any medical evidence to suggest, that he suffers from any form of epilepsy or a central nervous system vascular accident.

Plaintiff asserts that he "cannot maintain any type of social functioning, has marked difficulty in concentration, persistence and pace, and has repeated episodes where he decompresses [sic] and cannot interact with anyone because of the aggressiveness of his personality," citing several medical sources in support of this claim, including Drs. Tulipan and Nyquist.[9]  (Pl.'s Br. (Doc. No. 10) at 4-5.) Though these limitations are relevant to a determination under § 12.02 and § 12.08, the ALJ specifically determined that Plaintiff did not suffer from these symptoms at a level of severity meeting the requirements of these sections.[10]  (AR 16.)

In order to meet § 12.02 or § 12.08, Plaintiff must show that he meets the requirements of paragraphs A and B, or A and C, in the case of § 12.02.  On this record, there is substantial evidence to support the ALJ's conclusion that Plaintiff failed to meet this burden.  The ALJ clearly considered Plaintiff's physical, mental, and emotional limitations.  He specifically discussed Plaintiff's anger problems, citing a letter from Dr. Nyquist on this issue, and he took Plaintiff's social interaction restrictions into account in his hypothetical questions to the VE at the hearing.  (AR 17, 244.)  The ALJ observed that the evidence indicated that Plaintiff was only "minimally restricted" physically, and was "very intelligent" and "quite capable."  (AR 16.)  Even though the ALJ states that "[t]here is no doubt that the [Plaintiff] has been severely damaged," he nevertheless concludes that "[h]is impairments do not rise to listing level severity." (AR 16.)  The record is devoid of medical evidence of symptoms of sufficient severity to support a finding that Plaintiff meets either listing § 12.02 or § 12.08 and Plaintiff failed to meet his burden at this step.[11] Therefore, because the ALJ considered and evaluated the medical evidence of record, and substantial

---

[9] The language in Plaintiff's brief describing Plaintiff's functional limitations appears to be pulled directly from the language in section B of both listings, with the exception of the use of the word "decompresses," where the listing uses "decompensation."

[10] Section B requires at least two marked restrictions in activities of daily living, maintaining social functioning, concentration, persistence, or pace, or repeated episodes of decompensation of extended duration.

[11] Further bolstering the ALJ's findings, there is some evidence to suggest that Plaintiff's symptoms were actually improving.  Dr. Mawn examined the patient six months post injury and described him as "alert and oriented X4 and pleasant throughout the exam." (AR 172.)  At the hearing, when asked about her father's memory loss, Plaintiff's daughter stated that "it's gotten a little bit better," and further indicated improvement of other symptoms.  (AR 240.)  In a May 2002 examination, Dr. Nyquist's clinic notes indicated that Plaintiff was "no threat to others," and in a January visit (date illegible), Dr. Nyquist noted "better on Rx," and "handled self in court."  (AR 216, 211.)  Therefore, six months post-injury and beyond, Plaintiff was displaying positive behaviors inconsistent with the symptoms alleged.

evidence supports the conclusion that Plaintiff's injuries, though serious, do not rise to the level required by the listings, the ALJ's analysis at step three was proper.

**B.** **The ALJ did not err in determining that Plaintiff was not fully credible.**

The ALJ is charged with evaluating the credibility of Plaintiff at the hearing, and the ultimate decision as to credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [his] subjective complaints." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Plaintiff argues that the ALJ erred in disregarding Plaintiff's testimony about his restrictions and limitations due to his alleged personality disorder and anger problems. (Pl.'s Br. (Doc. No. 10) at 6-7.) However, the ALJ specifically states that he *did* find Plaintiff to be credible. (AR 17.) The ALJ states that "this claimant is sympathetic *and his testimony is credible.*" *Id.* (emphasis added) The ALJ continues, explaining that "[d]espite [his] empathy for this claimant, the objective medical evidence, as well as the claimant's own honest assessment of his capabilities, just do not support a finding that he is disabled." (AR 17.) In short, though the ALJ believes that Plaintiff's life has changed because of his injuries and restrictions, even with these changes, Plaintiff is simply not disabled within the meaning of the Act. The ALJ explicitly stated that he found Plaintiff to be credible, but even crediting Plaintiff's testimony regarding his limitations, Plaintiff is not disabled. Therefore, any assertions of error with respect to the ALJ's assessments of Plaintiff's credibility do not merit further analysis. Even assuming, *arguendo*, that the ALJ somehow implicitly failed to credit Plaintiff's statements by virtue of his findings, the ALJ still clearly and adequately stated his reasons, and substantial evidence supports his findings.

**C.** **The ALJ did not err in weighing the medical evidence and concluding that Plaintiff did not suffer from a severe mental impairment, and subsequently assigning an RFC for medium work.**

Plaintiff appears to assert that, in light of his alleged severe mental impairment, the ALJ erred in assigning any RFC. (Pl.'s Br. (Doc. No. 10) at 7.) Plaintiff attempts to rely on a discrete sampling of the medical evidence in support of his argument that he has a severe mental impairment, and alleges that the ALJ did not give adequate weight to the opinions of his treating physicians. (*Id.*)

The ALJ is charged with assessing Plaintiff's RFC based upon the record in its entirety. 20 C.F.R. § 416.946. Though the ALJ is not bound by the opinions and assessments of treating physicians, he must nonetheless consider and weigh them, and give reasons for rejecting them. *See generally Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (discussing the Social Security Administration's "treating source rule"). Social Security regulations and well settled case law require the agency to "give good reasons" for disregarding the medical opinion of a treating physician. 20 C.F.R. § 404.1527(d)(2); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) (stating that the ALJ must "set forth some basis for rejecting these opinions"). Medical opinions and diagnoses of treating physicians typically receive substantial deference, and if uncontradicted, complete deference. However, this is only true if the opinions at issue are based on sufficient medical evidence. *Harris v. Heckler*, 756 F. 2d. 431, 435 (6th Cir. 1985) (internal citations omitted).

Plaintiff asserts that he has a severe mental impairment. The only medical evidence contained in the record that might suggest mental limitations on this level is the medical source statement of Dr. Nyquist. (AR 191-92.) Dr. Nyquist assessed a *marked* limitation in the ability to interact appropriately with supervisors, coworkers, and the public, and a *marked* inability to respond appropriately to work pressures and changes in a usual work setting. However, Dr. Nyquist's assessment does not comport with his treatment notes, which indicate that Plaintiff was actually doing well and improving with medication. For example, in May 2002, Dr. Nyquist noted that Plaintiff was doing better and had fewer symptoms. (AR 216.) In January 2003, he noted that Plaintiff was better on his current medication. (AR 211.) The record reflects that the ALJ fully considered Dr. Nyquist's assessment. (AR 16-17.) After a review of Dr. Nyquist's treatment records, the ALJ stated that Dr. Nyquist "does not provide any information to support his assessment." (AR 17.) The ALJ subsequently assigned an RFC that did not include any marked limitations and, in fact, found based on the record as a whole that Plaintiff had only *moderate* limitations in dealing with supervisors and the general public, indicating the ALJ did not wholly accept the statements of Dr. Nyquist. (AR 17.) Because the ALJ clearly considered the medical opinion and records of Dr. Nyquist and the other physicians and examiners, and provided his reasoning for not fully crediting Dr. Nyquist's unsupported assessment and assigning the RFC that he did, the ALJ did not err.

**D.      Plaintiff's remaining assertions of error are without merit.**

In light of the foregoing, Plaintiff's argument that the VE's testimony supports a finding of no RFC is without merit.  The VE testified that an individual with marked limitations such as those described by Dr. Nyquist in the previously discussed assessment could perform no work.  (AR 245.)  A hypothetical question based on marked mental limitations is not relevant to Plaintiff here because the ALJ properly assessed only moderate mental limitations.  *See* Section C, *supra*.  Therefore, the ALJ was correct in not relying upon the VE's response to that question.  The ALJ properly relied on the VE's responses to other hypothetical questions which properly took into account limitations that were relevant to this plaintiff.

Plaintiff's fifth assertion of error is merely a general statement disagreeing with the ALJ's finding that Plaintiff is not disabled within the meaning of the statute.  It does not enumerate any specific errors, and will therefore not be addressed further.

In sum, the ALJ properly concluded that Plaintiff's impairments did not meet a listing and that Plaintiff's allegations regarding his anger problems were unsupported by the evidence of record and therefore not fully credible.  Further, the ALJ properly found that Plaintiff did not suffer from a severe mental impairment, and the ALJ correctly assigned an appropriate RFC based on the evidence of record.  Therefore, the decision of the ALJ rejecting Plaintiff's claim for SSI is supported by substantial evidence and must be affirmed.

**III.    CONCLUSION**

For the above stated reasons, Plaintiff's motion for judgment on the record (Doc. No. 10) will be denied and that the Commissioner's decision affirmed.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge